Judges of the United States Court of Appeals for the Second Circuit Hear ye! Hear ye! Hear ye! All persons having business before this, a stated term of the United States Court of Appeals for the Second Circuit, draw near, give your attention, and ye shall be heard. God save the United States of America and this honorable court. Please be seated. Morning, everyone. We have four argued cases on the calendar today, and two cases that are taking on submission. That's United States v. Whitaker and Canoes v. Protext Mobility. I've been told that counsel is ready and prepared to argue in all the cases on the calendar this morning, so I'm going to dispense with reading the calendar. I think we're ready to begin. The first case is Abdel-Fakhara v. State of Vermont. Good morning. May it please the court, Russell Barr on behalf of the appellants. We're before this court for a reversal and a remand of multiple constitutional rights claims and related state tort claims against state officials, particularly the Department of Financial Regulation, the Vermont Department of Financial Regulation. The judge in the lower court district court had made multiple factual inferences against our pleadings. In particular, we filed a 28-J letter with the court that explained to the court that the state superior court judge had already ruled on the DFR official acts as pursuing an investigation. Now, why is that important? And I only have a few points to sort of drill down into. Why is that important? Because the district court had made a finding that the Department of Financial Regulation, when they came in to administer the Agency of Commerce and Community Development in this EB-5 program, that they were acting in an investigatory manner. Well, the state superior court judge ruled exactly the opposite, and we filed that with the court. Essentially, the superior court judge said that they're acting as administrators, and that was what was promoted to our clients, of which we have ten named plaintiffs, and we represent a class of 105 foreign nationals that have invested in the Vermont state projects. Now, why is that important that they came in to administer the Vermont Department of Financial Regulation? It's they executed an MOU, the Vermont Department of Regulation, and along with the ACCD, of which they agreed to execute a policy to preserve the securities laws and the particular documents that were presented to my clients. What ultimately happened is that was not done. So they did not retract that policy. They certainly did not explain that to the appellants. And what's very important, certainly from our perspective point, is that when we filed our original Sutton complaint in 2017, we moved for discovery a month later in that case. We had a suspicion. We had a hint. We did not have the facts. The state moved to stay that discovery, and they were successful. The trial judge in that situation dismissed the case in totality. It was not until 2021 that we were able to, on behalf of plaintiffs in a different case, state court case, which essentially was a negligent undertaking case, we were able to start getting information. And what I would like to have- As I understand your adversary's argument, in talking about accrual, it occurs when you discover the critical facts of injury and cause, and suspicions may give rise to a duty to inquire. So what they're saying is you say that the SEC complaint, by virtue of the fact that it excluded Pure Bank, Pure Berk, rather, gave your clients no basis for believing that DFR had not fulfilled its obligations, but the hotel was named as a relief defendant. It received proceeds emanating from the fraud. It was in receivership. So why did that not- Your clients' funds had already been dispersed. Why didn't that trigger some, at least, duty to inquire further? And that's not even talking about the sudden complaint that comes later. Thank you, Your Honor. I have two points on that I'd like to address. One, the duty to inquire was begun with a discovery request a month after the filing of the case, as I just noted. The discovery was not received, and it's still being received, as showed in the February 23rd state court order. But if that's not enough, the state, unfortunately, has acted in every manner, shape, or form, to either argue sovereign immunity or now statute of limitations, technical defenses. But the plaintiffs had no ability, and I'll punctuate this point on the injury here, which is so extraordinary for foreign nationals is the investment is large, but their immigration status looms even larger. And what happened here is they did not, and we have ten named plaintiffs, it's a very unfortunate situation, that are worried about deportation, even going to visit a family member because they don't know what's going to happen to JFK, as an example. They did not know of that injury until they received from the United States Customs and Immigration Service their denials. Their denials started coming in in 2021. They couldn't possibly, just based on chronology, they couldn't possibly have known about that injury. And I'll tie that into what the Vermont Department of Regulation actually approved. They approved this offering document to these investors based on a subset of rebooting the branding of Vermont. I'm sorry, counsel, could you just back up a second? Sure. Are you suggesting that they couldn't have been on inquiry notice until the federal government denied their EB-5s? They could not have known, I'm sorry. Yeah, they could not have known about their immigration injury. Because when they invested in this particular project, it wasn't just a hotel. The offering documents were for, I believe, a hundred and- So hypothetically, if they had known or been on inquiry notice, that this whole thing was permeated by fraud, but they weren't yet aware that the federal government would deny them immigration benefits? You're saying that the statute of limitations didn't start to run? I would say that- I'm not following. Is that what you're arguing? That's part of it. That's part of the argument. So that is part of your argument. Yeah, that is part. In effect, they did not, our clients did not receive notice of their immigration denial. So is the idea that even, again, assuming hypothetically that they were on notice, that this whole thing was fraudulent, it was going to completely fall apart, there would be no investments, that until they knew that, well, I don't know, maybe the federal government will look sympathetically on them for forgiving them for this whole thing falling apart and saying it's not your fault. You're saying even if they, let's say, hypothetically knew the whole thing was fraud and would fall apart, that still wouldn't give rise to something, a duty that triggered the statute of limitations running? Yeah, allow me to explain. At least I hope I can explain this. It's subtlety. But going back to the pleadings, going back to the original case, we did actually, based on the hint of suspicion, name the DFR, but we had no evidence. We had no, so the next thing that would happen would have been a Rule 11, certainly. So that was taken out. They had no, to get right to your point, they would have had no way of knowing what was going to happen because the state was hiding this centrally. No way of knowing what was going to happen. Can you specify what you mean by what? Sure. No, it's fair because it gets to the complicated nature of the job creation. My clients, the appellants, would never have known that the hotel was not going to be built, the project, which was a much larger project than just a hotel. The state of Vermont made a decision that they needed to get this hotel built with my clients' money. They would not have known that until, well, number one, the receiver made a decision not to complete the hotel, lack of funds, and two, until the USCIS actually issued you cannot have your job creation because you haven't built what the offering documents have said. So the offering documents are the overriding picture for the job creation. If you do not produce what your offering documents say, like in this case, the government, the USCIS has said you cannot show that you've created your jobs, therefore your 829 is denied, meaning the permanent green card. But you're suggesting that only the immigration consequence is what put your client on notice that there was something amiss here. But doesn't the fact that they went into receivership, as Chief Judge Livingston asked you at the outset, put your client on notice, there's some problem here, which may ultimately result in the consequence of a negative immigration result. That's a fair question. And the response to that is that once it was in receivership, the plaintiffs, the appellants, would not have any idea of knowing the actual cause, meaning the rescinding of the policy to ensure compliance. What they did know is that there was fraud by the developers. What was not knowable without the tools of discovery would not have been knowable was the actual cause of that injury financially and immigration-wise. And I gather the point is, okay, this project went into receivership, but why would the foreign national or anyone know that the Vermont Department of Financial Regulation had rescinded or otherwise not performed their promises as outlined in the offering documents? Am I answering that to some degree? Well, I guess I'm also puzzled by the fact that your client on their, well, not your client, I'm sorry, but your client in another action, the Sutton action, as noted in the district court's opinion at footnote four, that your clients voluntarily removed the defendants, DFR, Michael, PCX, Susan Donegan, and others that are now named here, when it filed its Fourth Amendment complaint. And I understand maybe you had a suspicion, but you didn't have the evidence. But does that relieve your clients of an obligation to file the suit timely and pursue that discovery as they did in the underlying Sutton case? So we would not have been able to receive any discovery in any other case because we were not getting discovery in the underlying case. That, again, we had the suspicion, although we did not know the far reaching, and we attempted through discovery to actually get that information. Is it equitable estoppel? I would maintain it is. Is it equitable tolling? I think clearly because the discovery, no one sat on their rights here. There was no way for us to actually get this information, even to the point now. As my colleague points out, it's not these plaintiffs who were pursuing that discovery in Sutton. They didn't act until years later. Right. But I understand your argument that there should be equitable tolling, but that wasn't presented to the district court, was it? Yes, it was. It was. How was it presented? I'm sorry? How was it presented? It was presented in an outline of a way of cruel suspension. And, in fact, the equitable tolling was addressed incorrectly by the district court by saying it would be reasonable to infer that although plaintiffs learned of their financial loss at the time of the April 16th SEC press conference, they might not have learned of the cause of their injury until they learned more about the involvement of the Vermont Regional Center and other state agencies during discovery. That's an inference against us. We did not have that tool. We'll hear from your adversary. Okay. Thank you very much. Thank you. Good morning, Your Honors, and may it please the court. Kate Gallagher on behalf of the appellees. Given the limited amount of time available for argument, I'm going to focus on the claims against the individual employees and address two questions. Are the federal claims against them barred by the statute of limitations, and are the state law gross negligence claims barred by the doctrines of absolute and qualified immunity? The answer to both of those questions is yes. Let me turn first to the statute of limitations. The appellants are arguing that their claims are timely because they're entitled to the benefit of the accrual suspension rule. But that rule only applies if an injury is inherently unknowable or concealed, and neither of those things was present here. If you look at the amended complaint, it's clear that these individuals invested after receiving an offering document that explained the state's role in conducting a review of the project, as well as the SEC's conducting of a review, that they invested pursuant to the terms of an escrow agreement that allowed the state to release their funds under certain circumstances, that they knew their funds were dispersed, and they knew in April of 2016 that the SEC had filed an enforcement action, and as a result of the receivership that was part of that action, the Q Burke project was placed into receivership. And there's no question if you look at the, for example, paragraph 98 of the complaint, they say in April 2016 the last of the investor funds were dispersed, and within days thereafter the projects were plunged into liquidation and receivership, and at 108 they say at that point contractors were paid and there was nothing left of their investment. So from their perspective, the taking occurred when the receivership involved the Q Burke project. Now they attempt to manufacture a separate and different type of injury in order to get around this problem, but if you look at count two of the amended complaint, which is the due process count, it's clear that the injury they're still focused on is the investment injury. They say that by virtue of the PPM, the defendants assumed a responsibility to enforce all applicable laws. At 164, the escrow agreement gave the defendants authority to control and disperse their funds unless they requested a refund, and that at paragraph 170, because they did not have notice that they were not ensuring compliance with law, plaintiffs could not reasonably act on the 30-day window provided by the escrow terms. So it's clear that the injury is the investment, that is the taking. Now this morning your colleague makes the argument, well, maybe in 2016 we may have had some information that we were injured, but not any information about the cause. Well, I think it's... Particularly your client's role in the cause. Right, but I don't think that actually that is what's required. It's a hint or suspicion of the injury itself, but even if they needed to know the cause, they knew the state's role in the escrow agreement. They knew that by virtue of that, it was the state that had dispersed them. They knew that the state had the authority and ability to do that under certain circumstances, none of which required a financial review. So not only was the injury to their investment known, it was certainly knowable that, in fact, not that there was an injury to their immigration benefit as well, because once the funds are not in receipt, the project is in receivership, there's a question of whether or not the funds all went into the project, and the immigration injury flows from that. And there's no question that they knew about their immigration injury. You need only look at the third amended complaint in the Sutton matter, which refers specifically to the notice of intent to terminate that was issued by USCIS. And pursuant to that, there was clear that the USCIS considered the application by QBIRC investors for immigration benefits to be improper, and they determined that because the SEC had said that funds used from other projects had been used to purchase the mountain. So the funds that were not used appropriately, USCIS was concerned, was saying, we're not going to consider your immigration benefits. So not only did they know about their investment injury, they knew about their immigration injury. Just remind me of the timing of the USCIS notification. That was in August of 2017. Now, they also argue now that the MOU creates some kind of substantive rights, but it's clear that it doesn't. It's not a statute, it's not a policy, it's an agreement between two entities of state government that doesn't create any mandatory obligations. Obligations could be waived or renegotiated at any time. And in fact, if you look at the language, it doesn't create a guarantee that the department would always ensure that any EB-5 offering complied with law. I mean, the actual agreement shows and contemplates ongoing review to ensure ongoing compliance. And when that happens, the DFR then has a further determination to make, whether to pursue enforcement, to cancel the MOU. So there's no mandatory obligation. And the MOU doesn't confer any benefits on the QBURC partners. It doesn't mention the QBURC partners. It doesn't mention the release of escrowed funds. It doesn't even say that if there's a determination of noncompliance that you have to notify investors. And even if they were entitled to the benefit of the accrual suspension rule, the second complaint, and not only the first, but the third, demonstrate that they knew of their injury and its cause. If you look at the third amended complaint, paragraph 225, it says, in April 2015, DFR willingly approved the JPEG projects to solicit prospective investors for the fraudulent JPEG projects at QBURC and ANCBIO. So there's no question they understood in their way of thinking that this was fraudulent and they had an injury as a result of that. So for those reasons, Your Honor, I submit that the claims are barred by the statute of limitations. Let me turn to the immunity issues. First, the appellants don't contest that Moulton, Kessler, and Fulham are entitled to immunity. They make no arguments with respect to them. So I would request that you affirm on those claims. Let me turn to the claim against Susan Donegan, who was the commissioner of the Department of Financial Regulation. She is entitled to absolute immunity. Under Vermont law, which is slightly different than federal law, you only have to ask two questions to determine whether or not she's entitled to absolute immunity. Is she a high-ranking officer? And is the conduct complained of a conduct that's related to her broad statutory duties? Both of those questions here are yes. We cited the current case in our brief that says that commissioners are high-ranking officials. And then you need only look at Title VIII, Section 10, which is a declaration of policy regarding the DFR, where it says, the commissioner supervises organizations that offer financial services and products to protect consumers. And Section 11 makes clear that that includes securities under Title IX. And 10 VSEA 20E wasn't the first time that she had authority to regulate these investments. Interests in limited partnerships were already securities, as defined in Title IX, Section 5102.28d. So she had broad authority to regulate securities. And her authority, that's exactly the conduct. She was supervising entities that are offering these types of products. Now, with respect to qualified immunity, essentially the appellants argue that the district court didn't understand the arguments. That's not correct. They're saying, well, it didn't, you know, they should have acted sooner is what the court said. No. If you look at page 43, the court stated, plaintiffs allege that although Mr. Pichek knew of the Ponzi scheme, he allowed the PPM to circulate even though it did not warn investors about the fraud or potential litigation. So he fully understood the arguments they were making. But what he did is he applied the two steps of the Sutton case articulation of qualified immunity and said, well, there's no clearly established law that required them to act sooner or differently. And in fact, could reasonable officers have acted in this way? He said, absolutely. These were individuals who were facing a dilemma. And I would say it was a Hodgson's choice. Do you stop the project at this point and investors are not permitted that are already in the project, end up with a pile of rubble, no asset and no ability to seek a green card? Or do you use an escrow agreement to finish the project, which was moving quite a bit towards completion, and give them at least the opportunity to have an asset, if not immigration benefits? So the court understood that argument and rejected it. It also understood the argument that there was some kind of ministerial duty here. The courts at 45 said plaintiffs are arguing that PCHEC assumed the PPM's guarantee that DFR would ensure all immigration and securities laws are being complied with. But what the court then did is look at that document because it was an integral document and said, none of these individuals executed that document. And the same is true here with respect to the MOU. So these individuals didn't undertake some obligation that was ministerial. The court knew that and it rejected that. So for all of these reasons, I submit that the decision below should be affirmed because there's no reason for this court to reach a different result. Thank you. We'll hear Rebecca. Very quickly, Your Honor. Thank you. There is no immunity for violating law. What was stated and what the district court agreed to is that these Vermont Department of Financial Regulation officials were in a investigatory fashion. Could you just back up to your first statement? There's no immunity for violating law? There's no. What other kind of immunity would there be? There's no immunity for violating a clearly established law such as, I apologize for being quick on that. Because if you didn't violate the law, you don't need immunity. Right. So I just wanted to clarify. Okay. Fair. I'm sure we're all in the same ballpark here. Yeah. And this situation, as the state has just argued, is that they were trying to balance the rights for these individual investors. That is violating the law under securities law. You have to disclose material information to the investors. Instead of disclosing material information, the Vermont Department of Financial Regulation made a decision to collect their funds. And it's very important, certainly, is to distinguish between what the notice of intent to terminate and the actual termination was discussing. Negligent oversight, very parallel to the Sutton case. It was not discussing fraud based from the Vermont Department of Regulation. That is something that is very hard to understand or believe, but that is what happened here. That law was established, promoted. That policy was established and promoted to the investors. We are ensuring compliance with securities and immigration laws. No reasonable person would have assumed that that was not true. And that turned out to not be true, certainly later in the course of this case. And just to punctuate this point about discovery and the equitable tolling, again, we've only received documents after the February 23, 2023 order of the Superior Court judge that essentially found that the DFR was not operating in an investigatory role. The DFR was operating in an administrative role. That is significantly different here when we cut to the immunity question. So in conclusion, I would just like to say that this is an immigration program that from my experience of talking and working with these foreign nationals, they come here for three reasons. They come here for political stability and economic opportunity. Believe it or not, they come here for clean water,  It certainly seems from the appellant's perspective that the rule of law is being used against them on a very technical basis when, in fact, no one within these groups have sat on their hands. They've done whatever they can do to get to the truth. And to wrap back to that point of a hint or a suspicion was immediately sought in discovery, immediately. And it was stayed. And then the case was dismissed. And now we're in 2021. I think it's only, if you think of the equitable doctrine, it certainly weighs on the side of the appellants here. I appreciate your time. Thank you. Thank you both, and we'll take the matter under advisement.